Matter of C.K. v Tahoe (2022 NY Slip Op 05899)

Matter of C.K. v Tahoe

2022 NY Slip Op 05899

Decided on October 20, 2022

Appellate Division, Third Department

Clark, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 20, 2022

532572

[*1]In the Matter of C.K., Individually and as Parent of N.A., an Infant, et al., Appellants, et al., Petitioners,
v
Shannon Tahoe, as Acting Commissioner of Education, et al., Respondents.

Calendar Date:September 13, 2022

Before: Garry, P.J., Egan Jr., Clark, Fisher and McShan, JJ.

Kostelanetz & Fink, LLP, New York City (Claude M. Millman of counsel), for appellants.
Letitia James, Attorney General, Albany (Beezly J. Kiernan of counsel), for Acting Commissioner of Education and another, respondents.
Sylvia O. Hinds-Radix, Corporation Counsel, New York City (Philip W. Young of counsel), for Chancellor of the New York City Department of Education and another, respondents.

Clark, J.
Appeal from a judgment of the Supreme Court (George R. Bartlett III, J.), entered October 23, 2020 in Albany County, which dismissed petitioners' application, in a proceeding pursuant to CPLR article 78, to review a determination of respondent State Education Department denying the applications of petitioners' children for admission to Specialized High Schools.
During the first half of the 20th century, New York City established three specialized high schools (hereinafter SHSs) — Stuyvesant High School (in 1904), Brooklyn Technical High School (in 1922) and the Bronx High School of Science (in 1938) — each of which would provide students with a specialized program of rigorous instruction. Starting in 1934, Stuyvesant High School began to conduct an admissions process based exclusively on a prospective student's score on a single examination, which came to be known as the specialized high school admissions test (hereinafter SHSAT). Soon after, Brooklyn Technical High School and the Bronx High School of Science began using the SHSAT to fill their seats; however, each prospective student taking the SHSAT did so in connection with his or her application to one SHS. Each SHS would offer admission to students in descending order according to their SHSAT scores until the SHS filled its allotted score-only seats. As of the 1960s, each of the three SHSs also operated a "discovery program" aimed at increasing the diversity of its student body.
In 1971, the Legislature passed the Hecht-Calandra Act (hereinafter the HCA) — originally Education Law former § 2590-g (12) (see L 1971, ch 1212, § 1) but now incorporated by reference through Education Law § 2590-h (1) (b) (see L 1996, ch 720, §§ 6, 7) — which codified the admissions process for eighth- and ninth-graders seeking admission to one of the three SHSs then in existence.[FN1] The HCA also continued to permit, but not require, each SHS to reserve an unspecified number of seats to be filled through a discovery program for disadvantaged students. To qualify for the discovery program, a prospective disadvantaged student had to take the SHSAT and score below the cut-off score, be certified by his or her school as disadvantaged, be recommended by his or her local school as having high potential for the rigorous SHS program and have a satisfactory school record. Discovery program admission offers were made in the same manner used to fill the score-only seats — in descending order according to their SHSAT scores until the discovery program seats were filled — however, discovery program admission offers were made contingent on the student attending and passing a summer preparatory program (hereinafter the summer program) administered by the SHS.[FN2] The Legislature did not establish a definition for a "disadvantaged" student, but under the criteria used until the 2018-2019 academic year, respondent New York City Department of Education (hereinafter DOE) defined a disadvantaged student as one who qualified for free lunch[*2]; attended a Title I school and qualified for reduced price lunch; received assistance from New York City Human Resources Administration; was a foster child, ward of the state or in temporary housing; or had entered the United States within the preceding four years and lived in a home where English was not the primary language.
Between 2002 and 2008, DOE opened and designated (or redesignated) five additional high schools as SHSs — High School for Mathematics, Science and Engineering at City College of New York; High School of American Studies at Lehman College; the Brooklyn Latin School; Queens High School for the Sciences at York College; and Staten Island Technical High School.[FN3] Although the parties did not establish an exact timeline, with eight SHSs in existence, DOE made some changes to the admissions process to allow prospective students to use a single sitting of the SHSAT to apply to one, some or all of the SHSs. Under this unified admissions process, a student applying to multiple SHSs ranks the SHSs that he or she wishes to attend, in order of preference. Students are not considered for admission into any SHS for which they do not indicate a rank. Students are then listed in descending order according to their SHSAT scores; the student with the highest score is offered admission into his or her first-ranked SHS, then the next student receives an offer to his or her first-ranked school, and so on, until all the allotted score-only seats in a particular SHS are filled. The score of the lowest-scoring student admitted into the last score-only seat at any particular SHS will also become the score-only cut-off score for that SHS. The next student on the list whose first-ranked SHS has filled its score-only seats is then offered admission into his or her second-ranked SHS. This process is followed until all the score-only seats at all eight SHSs are filled.
Following the designation of the additional SHSs, their authority to operate a discovery program continued. However, DOE made one crucial change — to qualify for the discovery program at any SHS, a student must score below the cut-off score for the SHS with the lowest cut-off score (hereinafter the discovery program cut-off score). Prospective disadvantaged students are listed in descending order, starting from the discovery program cut-off score, and discovery program admission offers are made in the same manner used to fill score-only seats — the student with the next highest score is offered a seat at his or her first-ranked school, and so on, until the discovery program seats are filled. These discovery program admission offers continued to be contingent upon the student attending and passing the summer program.
Then, in an effort "to promote racial, ethnic, geographic, and socio-economic diversity" in the SHSs, respondent Richard Carranza, in his former capacity as the as Chancellor of DOE, adopted various changes to the discovery program in the summer of 2018, which changes first [*3]affected the admissions process for the 2019-2020 academic year. First, the Chancellor expanded the number of discovery program seats at the SHSs. Pursuant to this expansion, approximately 13% of the total SHS seats were reserved for discovery program students for the 2019-2020 academic year; approximately 20% were reserved for them for the 2020-2021 academic year.[FN4] Second, the criteria for a "disadvantaged" student also changed; a disadvantaged student is one who attends a school with an economic needs index (hereinafter ENI) of 60% or more and meets one of the following conditions: (1) the student's family income qualifies the student for free or reduced price lunch; (2) the student's family receives assistance from the NYC Human Resources Administration; (3) the student is in foster care, is a ward of the state, or is a student in temporary housing, as defined by the McKinney-Vento Act; or (4) the student is an English-language learner or a former English-language learner within the previous two academic years, and the student enrolled in a DOE school for the first time within the last four years. Third, DOE centralized the process, shifting the inquiry of whether a student is "disadvantaged" from the local middle schools to DOE itself. The discovery program admissions process continues to use a single cut-off score — the discovery program cut-off score — and admission offers continue to be contingent upon a prospective disadvantaged student completing the summer program.
N.A., R.B. and C.Y. (hereinafter collectively referred to as the student-applicants) sought admission to the SHSs for the 2019-2020 academic year; each took the SHSAT and ranked only the SHSs to which he or she sought admission. In March 2019, the student-applicants each received a letter informing him or her that he or she had scored below the score-only cut-off scores for his or her ranked SHSs. The student-applicants were all denied admission to the SHSs by DOE and the Chancellor (hereinafter collectively referred to as the City respondents). Thereafter, petitioner C.K., individually and on behalf of N.A, filed an administrative appeal pursuant to Education Law § 310, alleging that the discovery program was illegally implemented, that the discovery program is contrary to law and that the determination denying N.A. SHS admission was arbitrary and capricious. Two other sets of parents, petitioners D.B. and S.B., individually and on behalf of R.B., and petitioners A.T. and R.Y., individually and on behalf of C.Y., filed similar administrative appeals challenging the determinations that denied SHS admission to R.B. and C.Y., respectively. The administrative appeals brought by C.K., D.B., S.B., A.T. and R.Y. (hereinafter collectively referred to as petitioners) were consolidated into a single proceeding, and the City respondents answered. MaryEllen Elia, the former Commissioner of Education, dismissed the appeal, finding that petitioners lacked standing to challenge the changes [*4]to the discovery program, except as it related to the expansion of discovery program seats causing a reduction to the number of score-only seats. Regardless, Elia determined that the admissions criteria comported with the HCA, that the admission denials were not arbitrary and capricious and that the City respondents had not circumvented any required rule-making process.[FN5]
Thereafter, petitioners commenced this CPLR article 78 proceeding against respondent State Education Department (hereinafter SED) and respondent Shannon Tahoe, as Acting Commissioner of Education (hereinafter collectively referred to as the SED respondents), as well as the City respondents. Petitioners allege, among other things, that the student-applicants were unlawfully denied admission to the SHSs and that Elia's determination was arbitrary, capricious and contrary to law. Following oral argument, Supreme Court found that the determination was rational and not arbitrary or capricious, and the court dismissed the petition. Petitioners appeal, and we affirm.[FN6]
Initially, respondents argue that petitioners lack standing to challenge the discovery program. Contrary to petitioners' assertion that Education Law § 310 grants them standing to present their challenges for judicial review, that section merely lays out the Commissioner's authority to hear a wide array of matters under the purview of SED (see Matter of Board of Educ., Commack Union Free School Dist. v Ambach, 70 NY2d 501, 510-511 [1987], cert denied 485 US 1034 [1988]). Rather, "[t]o establish standing to challenge governmental action, the party asserting standing must show first, an injury-in-fact and, second, that the injury falls within the zone of interests or concerns sought to be promoted or protected by the statutory provision" (Matter of Lansingburgh Cent. Sch. Dist. v New York State Educ. Dept., 196 AD3d 937, 939 [3d Dept 2021] [internal quotation marks, brackets and citations omitted]; see Lujan v Defenders of Wildlife, 504 US 555, 555-556 [1992]). "The injury in fact element must be based on more than conjecture or speculation" (Matter of Animal Legal Defense Fund, Inc. v Aubertine, 119 AD3d 1202, 1203 [3d Dept 2014] [citations omitted]; see Matter of Safety-Kleen Sys., Inc. v New York State Dept. of Envtl. Conservation, 206 AD3d 1332, 1333 [3d Dept 2022]; Matter of New York State Bd. of Regents v State Univ. of N.Y., 178 AD3d 11, 18 [3d Dept 2019], lvs denied 35 NY3d 912 [2020]).
Petitioners challenge various aspects of the SHS admissions process, focusing most of their attention on the discovery program. Initially, we agree with petitioners that, because more seats were allotted to the discovery program beginning the year that the student-applicants applied, the number of available score-only seats was reduced, requiring the student-applicants to attain a higher SHSAT score to gain admission into an SHS. Indeed, the City respondents concede that if the SHSs operated no discovery program, two of the student[*5]-applicants would have been offered admission into one of their ranked SHSs. Such an injury — the denial of admission into an SHS — falls within the zone of interests promoted by the HCA's admissions process. As a result, we find, as did Elia, that petitioners have standing to challenge the expansion of the number of discovery program seats.
Further, petitioners have standing to challenge the use of the lowest-scoring SHS's cut-off score as the discovery program cut-off score, and we conclude that Elia erred in finding otherwise. Under this scheme, otherwise-eligible disadvantaged students who score above the discovery program cut-off score are ineligible to be considered for discovery program seats. To illustrate, such a student whose SHSAT score falls between the score-only cut-off score for their first- and second-ranked SHSs is precluded from a discovery program seat at their first-ranked SHS. Rather, that student is offered a score-only seat at their second-ranked SHS — a seat that, under a scheme utilizing individual discovery program cut-off scores, may become available to a student like the student-applicants. Because the admissions process falls within the zone of interests addressed by the HCA, petitioners may challenge the use of the discovery program cut-off score.
However, petitioners lack standing to challenge the logistics of the discovery program or the criteria for a "disadvantaged" student. Notably, the Legislature left the term "disadvantaged" undefined, and undefined terms should generally be given their ordinary meaning (see People v Williams, 37 NY3d 314, 318 [2021]; Breest v Haggis, 180 AD3d 83, 88-89 [1st Dept 2019]). However, the definition of "disadvantaged" — "lacking in the basic resources or conditions (such as standard housing, medical and educational facilities, and civil rights) believed to be necessary for an equal position in society" (Merriam-Webster.com Dictionary, disadvantaged [https://www.merriam-webster.com/dictionary/disadvantaged]) — lends itself to a wide range of interpretation, and our review of the statutory text and legislative history does not provide any additional guidance to narrow the term's intended scope. Rather, because DOE is charged with administering the HCA, defining the scope of a "disadvantaged" student is best left to that department (see e.g. Matter of Juarez v New York State Off. of Victim Servs., 36 NY3d 485, 493 [2021]; Godfrey v Spano, 13 NY3d 358, 376 [2009]; Matter of Kerri W.S. v Zucker, 202 AD3d 143, 159-160 [4th Dept 2021], lv dismissed 38 NY3d 1028 [2022]).
Nevertheless, petitioners concede that the student-applicants are not considered disadvantaged under the current criteria or under the prior criteria, and they do not provide any parameter under which the student-applicants should be considered disadvantaged or eligible for the discovery program. Because petitioners are unaffected by the criteria used to define a disadvantaged student or other intricacies of the discovery [*6]program — i.e., DOE requiring that prospective discovery program students attend a school with an ENI above 0.60 or the centralization of the certification process for disadvantaged status — their arguments are too speculative to establish standing to challenge such provisions (see Matter of New York State Bd. of Regents v State Univ. of N.Y., 178 AD3d at 18; compare Matter of Lansingburgh Cent. Sch. Dist. v New York State Educ. Dept., 196 AD3d at 939). Therefore, we do not reach the merits regarding the logistics of the discovery program or the criteria for a "disadvantaged" student.
Next, we turn to address the merits relative to the expansion of the number of discovery program seats and the use of a single discovery program cut-off score. Our review on this CPLR article 78 proceeding is limited to whether Elia's determination "was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]). "An action is arbitrary and capricious when it is taken without sound basis in reason or regard to the facts. When a determination is supported by a rational basis, it must be sustained even if the reviewing court would have reached a different result" (Matter of Spence v State Univ. of N.Y., 195 AD3d 1270, 1271 [3d Dept 2021] [internal quotation marks and citations omitted]).
Although petitioners concede that the HCA expressly permits SHSs to operate a discovery program to grant high-achieving disadvantaged students access to the highly selective institutions, they argue that the expansion of the number of discovery program seats impermissibly inflated the score-only cut-off scores for each SHS, causing the student-applicants to be denied admission. Notably, the HCA is silent as to the number of seats that may be allotted to the discovery program. Although such silence "is a strong indication that its exclusion was intended," we turn to the legislative history of the HCA for guidance (Matter of DCH Auto v Town of Mamaroneck, 38 NY3d 278, 293 [2022] [internal quotation marks and citations omitted]). When an earlier version of the HCA passed through the State Assembly, the bill included a 14% cap on the number of seats that could be reserved for the discovery program at each SHS (see Sponsor's Mem, Bill Jacket, L 1971, ch 1212). However, upon further debate in the State Senate, the cap was removed; the HCA then passed both houses of the Legislature and was later signed into law by the Governor (see Sponsor's Mem, Bill Jacket, L 1971, ch 1212). Indeed, the sponsor's memorandum to the Governor expressly stated that removing the cap would "continu[e] the discretion of the Board of Education with regard to the number of students who can be admitted under the [d]iscovery [p]rogram" (Sponsor's Mem, Bill Jacket, L 1971, ch 1212). Such powers to "[c]ontrol and operate . . . all [SHSs]" were thereafter transferred to the Chancellor when the Legislature restructured New York City's managerial structure (Education Law § 2590[*7]-h [1] [b]; see L 1996, ch 720, §§ 6-7).[FN7] It is thus clear that the Legislature empowered the Chancellor to determine the number of seats that each SHS could allocate for its discovery program. Further, we find that the City respondents had a rational basis — "to promote racial, ethnic, geographic, and socio-economic diversity" — to increase the number of disadvantaged students who are offered admission into the SHSs (see Matter of Montgomery v New York State Dept. of Corr. & Community Servs., 192 AD3d 1437, 1439 [3d Dept 2021], lv denied 37 NY3d 908 [2021]; see generally Christa McAuliffe Intermediate Sch. PTO, Inc. v de Blasio, 364 F Supp 3d 253, 280 [SD NY 2019], affd 788 Fed Appx 85 [2d Cir 2019]).
Next, we turn to whether the use of the discovery program cut-off score was contrary to law or arbitrary and capricious. Petitioners argue that the plain language of the HCA requires the use of an individual discovery program cut-off score for each SHS. Our reading of the HCA leads us to a different conclusion. The HCA states that any student who "score[s] above the cut-off score for the openings in the school for which he [or she] has taken the examination" earns a seat at that SHS (Education Law former § 2590-g [12] [b]). Further, a disadvantaged student could be considered for a discovery program seat if he or she "takes the regular entrance examination but scores below the cut-off score" (Education Law former § 2590-g [12] [d]). Put into context, in 1971, when the HCA became law, each SHS conducted an independent admissions process, and a prospective student's score on the SHSAT could only be used in connection to that student's application to one of the three SHSs then in existence. That independent admissions process meant that a prospective disadvantaged student scoring below the cut-off score for the SHS to which he or she applied would only be eligible for that SHS's discovery program.
While the parties did not establish exactly when the SHSs began to use the admissions process under review, the record makes clear that the eight SHSs have been conducting a unified admissions process, through which a prospective student can seek admission to multiple SHSs with a single SHSAT score, for many years prior to the 2018 discovery program changes. Under this process, any prospective student who "score[s] above the cut-off score for the openings in the school for which he [or she] has taken the examination" (i.e., the SHSs that the student has ranked) is offered admission, through a score-only seat, into that SHS (Education Law former § 2590-g [12] [b]).[FN8] In turn, any disadvantaged student who "takes the regular entrance examination but scores below the cut-off score" (i.e., the discovery program cut-off score) is considered for the discovery program seats available at his or her ranked SHSs (Education Law former § 2590-g [12] [d]). While this unified admissions process, including its use of the lowest scoring SHS's cut-off score as the discovery [*8]program cut-off score, varies from that which was in place in 1971, it continues to comply with the plain language of the HCA (see Matter of Lansingburgh Cent. Sch. Dist. v New York State Educ. Dept., 196 AD3d at 940; Matter of Nogueras v Coombe, 242 AD2d 806, 806 [3d Dept 1997]).
Further, respondents argue on appeal, and Elia found, that the use of the discovery program cut-off score is necessitated by the unified admissions process. We have long held that we "defer[] to the interpretation of the agency charged with administering a statute where, as here, the interpretation of a statutory term requires knowledge of underlying operational practices or the evaluation of factual data and rational inferences, rather than pure legal interpretation of statutory terminology" (Hollandale Apts. & Health Club, LLC v Bonesteel, 173 AD3d 55, 67 [3d Dept 2019]). Pursuant to the HCA, students seeking to gain admission into an SHS through the discovery program must successfully complete the summer program, and respondents warn that the use of an individual discovery program cut-off score for each SHS, as petitioners suggest, would cause significant delays in the already-complex New York City high school admissions process. Under such a system, the SHS admissions process would need to occur one SHS at a time — the SHS with the highest cut-off score would need to wait for prospective discovery program students to finish the summer program before finalizing its admissions process. Only then would the SHS with the second-highest cut-off score learn which score-only seats have been vacated by disadvantaged students who gained admission into the discovery program of the SHS with the highest cut-off score, as well as which students are available to fill its own discovery program seats. The SHS with the second-highest cut-off score would then need to wait for its own prospective discovery program students to complete the summer program before finalizing its own admissions process, which would then allow the SHS with the third-highest cut-off score to begin its own process, and so on. Ultimately, respondents warn, this process would cause students to remain in limbo until late in the summer, possibly into the fall semester. The delays in the SHS admissions process would also lead to delays in the admissions process for other New York City high schools, which would need to accommodate the students who are, in the end, not offered admission into one of the SHSs. Therefore, we defer to the City respondents' expertise in SHS admissions, and we decline to disturb the use of the discovery program cut-off score, which we find to be rational and not arbitrary or capricious.
With respect to petitioners' arguments concerning alleged procedural infirmities, they do not require extensive discussion. DOE is not a state agency within the meaning of the State Administrative Procedure Act and is therefore not subject to its provisions (see State Administrative Procedure Act §§ 100; [*9]102 [1]). Further, DOE is not bound by the City Administrative Procedure Act (see New York City Charter §§ 1041 et seq.), as local law cannot supersede the rulemaking powers granted to the Chancellor through Education Law § 2590-d (see Municipal Home Rule Law § 11 [1] [c]; NY City Corp Counsel Op No. 11-90, at *40). Lastly, we agree with Elia's finding that the Chancellor did not require approval from the Panel for Educational Policy to modify the definition for a "disadvantaged" student or to expand the discovery program at SHSs, as the Legislature granted the Chancellor the power to "[c]ontrol and operate" all SHSs (Education Law § 2590-h [1] [b]) and to manage "the day-to-day supervision [and] the administration of the operations of such schools" (Education Law § 2590-g [4]; see generally Bill Jacket, L 1996, ch 720). Petitioners' remaining contentions, to the extent that they have not been expressly addressed herein, have been examined and are without merit.
Garry, P.J., Egan Jr., Fisher and McShan, JJ., concur.
ORDERED that the judgment is affirmed, without costs.

Footnotes

Footnote 1: In relevant part, the HCA states that "[a]dmissions to the Bronx High School of Science, Stuyvesant High School and Brooklyn Technical High School and such similar further special high schools [that] may be established shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York in either the eighth or ninth year of study, without regard to any school district wherein the child may reside. No candidate may be admitted to a special high school unless he [or she] has successfully achieved a score above the cut-off score for the openings in the school for which he [or she] has taken the examination. The cut-off score shall be determined by arranging the scores of all candidates who took the examination and who then commit themselves to attend the schools in descending order from the highest score and counting down to the score of the first candidate beyond the number of openings available" (Education Law former § 2590-g [12] [b]; accord L 1971, ch 1212, § 1).

Footnote 2: In relevant part, the HCA states that SHSs are "permitted to maintain a discovery program to give disadvantaged students of demonstrated high potential an opportunity to try the special high school program without in any manner interfering with the academic level of these schools. A student may be considered for the discovery program provided the student: (1) be one of those who takes the regular entrance examination but scores below the cut-off score, (2) is certified by his [or her] local school as disadvantaged, (3) is recommended by his [or her] local school as having high potential for the special high school program, and (4) attends and then passes a summer preparatory program administered by the special high school, demonstrating thereby his [or her] ability to successfully cope with the special high school program. All students recommended by their local school for such a discovery program are to be arranged on a list according to their entrance examination scores, in descending order, from the highest to the lowest. Each special high school will then consider candidates in turn, starting at the top of the list for that school. A candidate reached for consideration on the basis of his [or her] examination score will be accepted for admission to the discovery program only if his [or her] previous school record is satisfactory" (Education Law former § 2590-g [12] [d]; accord L 1971, ch 1212, § 1).

Footnote 3: Although Fiorello H. LaGuardia High School of Music & Art and Performing Arts has also been designated as an SHS since 1961, that school conducts admissions through "competitive examinations in music and/or the arts in addition to presenting evidence of satisfactory achievement" (Education Law former § 2590-g [12] [c]; accord L 1971, ch 1212, § 1) rather than through the SHSAT, and this ninth SHS is not the subject of this litigation.

Footnote 4: During the 2011-2012 academic year, only four of the eight SHSs operated a discovery program. By the 2016-2017 academic year, six out of the eight SHSs operated a discovery program, with disadvantaged students accounting for between 4.95% and 13.68% of the total population at each SHS. A seventh SHS began operating a discovery program for the 2017-2018 academic year, and discovery program seats accounted for between 1.32% to 12.12% of the total enrollment at each SHS. For the 2018-2019 academic year, all eight SHSs operated a discovery program; discovery program seats accounted for between 1.46% and 13.49% of the total population at each SHS.

Footnote 5: Petitioners' administrative appeals were consolidated with administrative appeals brought by four other sets of parents (individually and on behalf of their respective children), and Elia reached some of these stated findings as they related to one other child, M.N., whose parents Elia determined had standing to bring those challenges.

Footnote 6: The CPLR article 78 proceeding was brought by petitioners and M.N.'s parents (individually and on behalf of M.N.); however, M.N.'s parents are not parties to this appeal.

Footnote 7: Through this 1996 restructuring, the Legislature expanded the overall powers of the Chancellor, granting that position the powers formerly held by the Board of Education, making the Chancellor the executive and administrative head of DOE and limiting the Board of Education to advising the Chancellor and policymaking activities (see Bill Jacket, L 1996, ch 720). The Legislature also removed the HCA from the reworked Education Law § 2590-g (titled "[p]owers and [d]uties of the [c]ity [b]oard") and incorporated the language of the HCA by reference through Education Law § 2590-h (titled "[p]owers and [d]uties of [c]hancellor") — providing us with a clear indication of legislative intent regarding the HCA.

Footnote 8: Petitioners do not challenge the unified admissions process.